## Case No. 16,275.

### UNITED STATES v. SHEREBECK.

[Hoff. Dec. 11.]

District Court. N. D. California. Dec. 5, 1859.

CONSTRUCTION OF FOREIGN STATUTES — MEXICAN LAND GRANTS—PUEBLO LANDS—AUTHORITY OF PREFECT—EVIDENCE—RECITATION IN GRANT.

[1. In the absence of any judicial decision determining the construction and effect of a foreign statute, the practical interpretation given to it by those whose duty it was to apply and administer it affords the best means of ascertaining its true construction; and such construction will be followed, unless it be clear that such officers have misinterpreted it.]

[2. Mexican prefects in California had power, under the 77th article of the organic law of 1837, to grant the common lands of a pueblo.]

[3. In a grant of pueblo lands by the prefect, a mention of the land granted as "within the demarkation" of the pueblo affords presumptive proof, in the absence of opposing evidence, that the land was so situated, and that the officer acted within the limits of his authority.]

HOFFMAN, District Judge. The claim in this case is for 800 varas of land on Rincon Point, in this city, alleged to have been granted to the claimant by Manuel Castro, prefect of the Second district of California. It was rejected by the board for want of evidence that the land was part of the common lands of the pueblo of Yerba Buena. The same tribunal, in the subsequent case of City of San Francisco v. U. S., confirmed the claim of the city to certain lands within boundaries mentioned in their decree. In this decision the United States have acquiesced by dismissing the appeal that had been taken to this court. [Unreported.]

It is not disputed that the land claimed in this case is within the demarkation of the pueblo of Yerba Buena, as ascertained by the decision in question. But as that case was between other parties, the point cannot be considered as res adjudicata in this; nor can the evidence on which that decision was based be regarded, for it has not been, by stipulation or otherwise, introduced in this cause.

The case now before the court must be determined on the evidence contained in the record above. No additional testimony has been taken in this court by either party. No argument has been made or brief filed on the part of the United States, and the case is submitted without the statement of any objection as to its validity, except that contained in the brief opinion of the board, and which relates solely to the defect of proof on a point which has since been thoroughly investigated and determined. It is to be regretted that in a case of so great importance the court is left to determine questions of

law without argument from both sides, and to decide questions of fact which it would seem could be ascertained with entire certainty merely by a preponderance of testimony. The cause was submitted to the court on the 26th of August, 1857, on briefs to be filed. The claimants have frequently called the attention of the court to the case, and they have a right to insist that a decision be rendered. I, therefore, proceed to decide it on the evidence before me.

The claimant has produced the grant made to him by the prefect, and an expediente containing the petition of Sherrebeck, dated November 24, 1845, the marginal order of reference of the prefect, and the "informe" of the local authority; also a letter signed "Pedorena," addressed to the prefect, and inclosing a sketch, and giving other information as to the place where Sherrebeck was soliciting. This letter is dated November 20, 1845, and the reply of the prefect, dated November 21, addressed to Sherrebeck, is also produced, in which he tells him that he can make his petition in conformity with this letter and diseño, as he, the prefect, could not properly draw up the petition as requested by Pedorena. The petition seems accordingly to have been drawn up three days afterwards, and the grant issued on the 5th December of the same year. The genuineness of the signatures to all these documents is proved by the testimony of the prefect himself and other witnesses. It does not appear from the transcript of the evidence before the board that any attempt to impeach their authenticity was made by the United States, nor is there any doubt on the subject any where suggested. The title papers must therefore be considered as gained.

Assuming them to be so, two questions are presented: (1) Had the prefect authority to grant the common lands of a pueblo? (2) Were these lands part of the common lands of the pueblo of Yerba Buena? The power of the prefect to grant the common lands of the towns is claimed to be derived from the 77th article of the organic law of 1837. This article is as follows: "They (the prefects) shall regulate (arreglaran) and conformably to the laws, the distribution (separtimiento) of the common lands (terrenos communes) in the towns (pueblos) of the district where there is no litigation pending in the tribunals respecting them, reserving to the parties their right of appeal to the governor, who, without further recourse, will decide the matter as may be proper, with the concurrence of the departmental junta." In the case of Lanos v. U. S., the construction of this article was considered by the board of commissioners, and it was decided that it conferred upon the prefects the power of granting the common lands. In the opinion delivered by Mr. Commissioner Thompson, the objections to

this construction, and the reasons for adopting it, are stated with his usual force and perspicuity. It was contended that the authority to "regulate" ("arreglar") did not impart an authority to grant, but merely a right to prescribe rules by which the distribution should be governed. This objection Mr. Commissioner Thompson admits would undoubtedly be correct if the word stood alone in the sentence, but he considers that the context indicates that the word was used in its technical sense, and that it means "to adjust the administration of provinces,—to enact laws for them." The subject which the prefect is empowered to regulate (arreglar) is the distribution ("separtimiento") of the common lands, which, he observes, is the word generally used to signify the granting of such lands. The prefect is further empowered to regulate this distribution executively ("gubain ativamente"). It appears from the provision of the organic law of March, 1830, that almost the same powers, functions, and duties were attributed to the governors and the prefects within their respective spheres, and the latter officers seem to have possessed, within their districts and over the matters committed to them, an authority nearly identical with that of the governor within his own department. They were, of course, subordinate to and under the control of the governor, but the nature of their functions was similar. When, therefore, the power to regulate the distribution of lands in the towns "gubernatively" is given to the prefect, it may justly be presumed that it is intended to confer on him the same authority with regard to those lands which the governor exercised over the department at large.

It was for these reasons that the board adopted the construction of the article which has been mentioned. I am much impressed with their force. They do not seem to me, however, entirely conclusive. It will be observed that the power of the prefects to regulate the distribution of lands, is limited to cases "where there is no litigation pending in the tribunals respecting them." This limitation or exception would seem to indicate rather an authority to settle disputes between the vecinos of the pueblo as to their occupation, than a power to grant them as property. To enable the inhabitants of a pueblo to avail themselves of the common lands of the pueblo in any other way than by pasturing cattle upon them in common, and procuring wood, etc., from them, it would obviously be necessary that an allotment of portions of them for the temporary but exclusive use of individuals should be made, for the purposes of cultivation. Unless such a distribution were made, it is not to be supposed that the necessary labor would be undergone by a few for the benefit of all. It was necessary, then, to secure to him who sowed the right of reaping; and

in this way various allotments would be made, and lands distributed among the vecinos.

It may, therefore, have been intended by the law to give the prefects the power of regulating this distribution, and for this purpose the exception of cases pending before the tribunals is natural and proper. The succeeding clause reserves to the parties their right of appeal to the governor, etc. It will be noticed that this right is not reserved to the "party interested," the usual phrase applied to a person soliciting a grant, but to the "parties," indicating, it would seem, two disputants; and the right reserved is not the right of presenting petitions for land to the governor, but the right of appeal to him; seeming to indicate that the matter appealed from was to be a quasi judicial determination. On this appeal the law directs that the governor "shall decide the matter as may be proper, with the concurrence of the departmental junta." The law does not direct him "to accede or not to the petition," or to "determine upon the solicitation," or use, with regard to his action, the phraseology employed with reference to an application for a grant, but it directs him to "decide the matter with the concurrence of the junta"; thus again seeming to indicate a proceeding, like an appeal to the king in council for the determination of a dispute, rather than an application for a gratuitous concession of land. If, then, this were a solitary instance of the assumption of the granting power by a prefect, I should be inclined to hold, notwithstanding my great respect for the opinion of the board on the subject, that the law of 1837 did not confer the power claimed. But it appears that the authority in question has been exercised by the prefects on various occasions. Nor have the rights attempted to be conferred by them even, so far as we can ascertain, been disputed. They appear to have been generally acquiesced in by adjoining proprietors, and even expressly recognized by the departmental authorities. In the absence of any judicial decisions which determine the construction and effect of a foreign law, the practical interpretation given to it by those whose duty it was to apply and administer it affords the best means of ascertaining its true meaning. Unless, therefore, it be clear that the officers charged with its administration have misconstrued it, a foreign court, with necessarily an imperfect acquaintance with the subject, ought to be slow to substitute its own construction of the law for that of the government which established it, or to declare that powers frequently exercised and generally acquiesced in were usurped. No objection on this point has been made by the United States, and in the face of the opinion of the board, and the practice of the former government, I do not feel that certainty that the construction I

feel inclined to adopt is the correct one, which would justify me in deciding that the prefect was mistaken as to the nature and extent of his powers.

2. The evidence that the land granted in this case was part of the common lands of Yerba Buena is contained in the two depositions of Castro, the prefect, and in the expediente. Manuel Castro swears that the lands granted by him to Sherreback, as also those granted to Presentacion Miranda de Ridley, were within the demarkation of Yerba Buena; that he was informed that the limit of Yerba to the south was a line drawn to the south of Rincon Point, across the estero and cienga or swamp, in a westerly direction to the Mission road; that all the citizens recognized the lands lying to the north of this line as belonging to Yerba Buena; that the judges reported to the same effect, and the line was established by custom. By the expediente it appears that the petition of Sherrebeck was referred to the "chief local authority" of Yerba Buena for the usual "informe." This official reported that "in the opinion of this juzgade, only land upon which to build a house and corral, and to plant, should be granted to him." The prefect accordingly grants him el Rincon, embraced within the demarkation of Yerba Buena to the extent of 800 varas square, and subjected him to the payment of the tax which might be assessed to him by the most excellent departmental assembly. In the grant the prefect recites that it is made in virtue of the power vested in him by the law of the 20th March, 1837, the provisions of which have been considered in a former part of this opinion. The provisions of that law give, as we have seen, authority to the prefect to regulate the distribution of the common lands of the pueblos, and the reference to it in the grant, and the mention of the land granted as "within the demarkation of Yerba Buena," afford, in the absence of opposing testimony, presumptive proof that the land was so situated, and that the officer acted within the limits of his authority.

In the case of U. S. v. Reading [18 How. (59 U. S.) 1], the supreme court held the recital in the grant, that the grantee was a citizen by naturalization, to be satisfactory evidence of the fact. So in this case the recital that the land is within the demarkation of Yerba Buena, and a reference to a law giving power to the prefect to regulate the distribution of the common lands of pueblos, as the source of his authority to make the grant in question, ought to be received as evidence of the fact. Castro himself testifies to the same effect, and states positively that the land granted to Sherrebeck was within the demarkation of Yerba Buena. Upon the whole, I think that, without reference to the evidence of the decision of the case of City of San Francisco v. U. S. [unreported], and looking alone to the evidence in this record, I am compelled to presume that the land granted was within the limits of the pueblo of San Francisco.

With respect to the occupation and cultivation of the land there is some conflict of testimony. On the part of the United States two witnesses have testified that they never saw any occupation or cultivation. On the part of the claimants several witnesses testify that a house was built, and a considerable part of the land cultivated, in 1845 or 1846. Obliged, as I am, to decide the case upon the evidence submitted, I have no alternative but to determine that the preponderance of testimony is on the side of the claimant. If the fact be otherwise than as testified to by them, it would have been easy for the United States to have established it. The condition of Rincon Point, and the existence of a house, with a considerable cultivation around it, on that point, at so recent a period as the years 1845 and 1846, could have been shown, it would seem, beyond all room for doubt. But, as before observed, no testimony whatever has been taken by the United States since January, 1846, when the transcript was filed in this court. No objection to the claim, for want of occupation and cultivation, is noticed in the opinion of the board, nor is any objection, whatsoever, to its validity, taken by the United States in this court. Under the evidence before me, I do not feel warranted to declare that the claim in this case has been forfeited by abandonment.

With respect to the location of the land, the testimony shows that in 1846, the alcalde of Yerba Buena pointed out to Sherrebeck, on the place called "El Rincon," the boundaries of the tract. He directed him to measure 400 varas in four different ways from an oak tree in the centre of the land, and the situation of which is identified by the witnesses. It was at the foot, or near this oak tree, that, as testified by the witnesses, the house of Sherrebeck was placed. Sanchez testifies that when he pointed out this tree as the place from which to begin the measurement, there was a brush house there, and that afterwards Sherrebeck built a log house, into which he was putting the windows, when the witness was on the point in 1846. There can be no doubt, therefore, if this testimony is to be believed, as to the precise location of the 800 varas granted to Sherrebeck, or, rather, of the land which he was authorized to occupy and cultivate under his grant.

Since the above was written, the testimony in the case of City of San Francisco v. U. S. [Case No. 12,316], has been filed by consent in this cause. I do not understand it to be disputed that that testimony establishes the existence of the pueblo of San Francisco, at the date of the grant in this case, or that the land granted was within the demarkation of the pueblo.